UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FAMILY HEALTH CENTERS OF
SOUTHWEST FLORIDA, INC., a
Florida nonprofit corporation

        Plaintiff,

v.                                Case No: 2:21-cv-278-SPC-NPM

SIMONE MARSTILLER and
XAVIER BECERRA,

        Defendants.
                                 /

## OPINION AND ORDER[1]

Before the Court is Defendant Secretary Xavier Becerra's ("Federal Secretary") Motion to Dismiss the Amended Complaint (Doc. 39), along with Plaintiff Family Health Centers of Southwest Florida, Inc.'s response (Doc. 43) and the Federal Secretary's reply (Doc. 47). Also before the Court is Defendant Simone Marstiller's ("State Secretary") Motion to Dismiss Amended Complaint (Doc. 40), along with Plaintiff's response (Doc. 44). For the reasons below, the Court grants the Federal Secretary's motion but denies the State Secretary's motion.

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

## BACKGROUND[2]

This case is about a Medicaid reimbursement rate. Plaintiff is a health center that treats Medicaid beneficiaries. It is reimbursed at a set rate for the services it provides. Plaintiff recently asked the State of Florida to increase its reimbursement rate to account for its growing workforce and services. The State mostly denied the request, and this suit followed. Before getting to the merits, background on Medicaid offers context to Plaintiff's claims and Defendants' motions.

Title XIX of the Social Security Act created Medicaid to enable states to provide medical care to certain low-income, elderly, and disabled persons. Participating states have flexibility to design and administer their programs. But their autonomy is limited in some respects. Pertinent here, each state must submit a "state plan" for the Federal Secretary to approve. And if a state later seeks to modify the plan, it must submit a "state plan amendment" for approval.[3] All state plans and any amendments must track federal laws and regulations.

---

[2] Because the Court writes for the parties, it assumes familiarity with the facts and writes only those necessary for resolving Defendants' motions.

[3] Technically, a state submits a state plan amendment to the Center for Medicare and Medicaid Services ("CMS") to whom the Federal Secretary has delegated its approval authority. *See* 42 C.F.R. §§430.14-430.15. To avoid further complicating this order with the technicalities of the Medicaid authority structure, none of which is being challenged, the Court will reference all agency action as being taken by either the Federal Secretary or the State Secretary.

Under Medicaid, states must reimburse federally qualified health centers ("FQHC")—like Plaintiff—for their covered Medicaid services. *See* 42 U.S.C. § 1396a(bb). Florida and other states use the prospective payment system ("PPS") to reimburse FQHCs at a predetermined, fixed rate. The rate is specific to each FQHC and is calculated based on historical costs of providing care to patients. A FQHC is not stuck with its fixed rate forever. The rate can be adjusted for "any increase or decrease in the scope of services furnished by the center or clinic during that fiscal year." *Id.* §1396a(bb)(3)(B).

What is meant by "any increase or decrease in the scope of services" is the crux of this suit. Because Plaintiff argues that Florida wrongly defines the phrase narrower than federal guidance, the Court reviews both definitions.

In 2010, CMS issued a general guidance (in a question-and-answer format) on what is meant by "any increase or decrease in scope of such services":

> A change in scope of FQHC and RHC[4] services should normally occur only if: (1) center/clinic has added or has dropped any service that meets the definition of FQHC and RHC services (i.e., that the FQHC or RHC is qualified to provide in the State); and, (2) the service is included as a covered CHIP[5] service under the CHIP State plan. Additionally, a change in the scope of services could also occur when a service is added or dropped as a covered CHIP service. **A change in the**

---

[4] RHC refers to rural health centers, which are not at issue.

[5] CHIP refers to Children's Health Insurance Program, which extends Medicaid to cover children.

> **"scope of services" is defined as a change in the type, intensity, duration and/or amount of services**. A change in the cost of a service is not considered in and of itself a change in the scope of services. The State must develop a process for determining a change in the scope of services.

*Prospective Payment System for FQHCs and RHCs*, Center for Medicaid and State Operations, (Feb. 4, 2010), https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SHO10004.pdf (bolded emphasis added).

In 2014, Florida submitted a state plan amendment ("SPA") that included the relevant change-in-scope definition. The definition materially mirrors language used in earlier versions of amendments ("Pre-Existing Language"). It says that a PPS rate may be adjusted for any increase or decrease in an FQHC's services. (Doc. 31 at 12). It then defines a change in scope of services to include adding a new service the FQHC did not previously provide or removing an existing service. (*Id.* at 12-13). But the definition stops there. Unlike its federal counterpart, the SPA does not account for the "type, intensity, duration and/or amount of services." The missing language fuels Plaintiff's claims.

Plaintiff sues the Federal and State Secretaries in their official capacities. Its three claims all center on the general logic that had the SPA included the "type, intensity, duration and/or amount of services" language in

the federal guidance, Plaintiff would have received the higher PPS rate it wanted. More specifics on each claim follows.

Count I is against the Federal Secretary for violating the Administrative Procedure Act ("APA"). It alleges the Federal Secretary acted arbitrarily and capriciously, abused his discretion, and acted against federal guidance in approving the SPA with its change-in-scope definition. Count II focuses on the State Secretary. It alleges he violated the PPS statute, § 1396a(bb)(3), because the SPA's change-in-scope definition is narrower than federal guidance. To round out the Amended Complaint, Count III seeks declaratory relief against both the Federal and State Secretaries under 28 U.S.C. § 2201. Boiled down, the relief Plaintiff wants is for the Court to:

- require the State Secretary to submit a new state plan amendment to the Federal Secretary that defines a change in scope of services to include "the type, intensity, duration and/or amount of services"

- require the Federal Secretary to review that new SPA

- require the Federal Secretary to disapprove the Pre-Existing Language from earlier state plan amendments

- require the State Secretary to grant Plaintiff the higher reimbursement rate

(Doc. 31 at 28-29).

Both Defendants have moved to dismiss the claims against them. Their arguments come next.

5

## DISCUSSION

**A. Federal Secretary's Motion to Dismiss**

The Federal Secretary moves to dismiss the APA claim (Count I) and the declaratory relief claim (Count III) for lack of standing and pleading deficiencies.

*1. Count I: APA Violation*

Plaintiff alleges the Federal Secretary's approval of the SPA, and the change-in-scope definition in it, is invalid because it is arbitrary, capricious, an abuse of discretion, and inconsistent with governing law. It also attacks the Federal Secretary for not retroactively reviewing the Pre-Existing Language to find it no longer meets the PPS requirements in § 1396a(bb)(3).

The Federal Secretary moves to dismiss Count I, arguing that Plaintiff lacks standing and states no plausible claim. Because standing is a jurisdictional prerequisite to sue, the Court starts there. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting.").

The Constitution limits federal courts to deciding only "Cases" and "Controversies." U.S. Const. art. III § 2. To satisfy the case or controversy requirement, a plaintiff must have standing to sue. *See Spokeo, Inc. v. Robins,*

578 U.S. 330, 338 (2016) (citations omitted). Standing requires that the claimant "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* In plain language, the standing elements are injury-in-fact, causation, and redressability.

The party invoking federal jurisdiction must prove standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When at the pleading stage, as here, the plaintiff "must clearly . . . allege facts demonstrating each element." *Spokeo*, 578 U.S. at 339 (citation and footnote omitted); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021). In reviewing a jurisdictional challenge to standing, courts must consider the pleadings and examine the whole record. *See Elend v. Basham*, 471 F.3d 1199, 1208 (11th Cir. 2006) (citation omitted).

The Federal Secretary challenges only causation and redressability. Because the Court can make quick work of redressability, it starts there. In assessing this element, a court "ask[s] whether a decision in a plaintiff's favor would significantly increase . . . the likelihood that [it] would obtain relief that directly redresses the injury that [it] claims to have suffered." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (citation omitted).

To fix Plaintiff's injury of not getting an increased reimbursement rate, Plaintiff needs the Court to require the State Secretary to write a new

7

amendment with "the type, intensity, duration and/or amount of services" language and to require the Federal Secretary to review it. Should the Federal Secretary approve the amendment, then the State Secretary also needs to find Plaintiff's growth qualifies under the new change-in-scope definition. Only then can Plaintiff get the increased PPS rate. But Plaintiff is asking too much from the Court in Count I and puts the cart before the horse.

There is no new state plan amendment before the Federal Secretary to review. That's because the State Secretary has yet to submit one, either by court order or voluntarily. So the Court cannot compel the Federal Secretary to review a non-existent amendment. What's more, Count I is not the vehicle to get the State Secretary to rewrite a new amendment as Plaintiff wants. But Count II could be. Count II is against the State Secretary and claims the SPA violates the Medicaid statute. Should Plaintiff succeed on it, then the State Secretary may submit a new amendment for the Federal Secretary to consider. Until that point, no decision by this Court in Plaintiff's favor will—or can— spike the likelihood that its injury will be redressed. Without redressability, Plaintiff lacks standing to sue the Federal Secretary.[6]

This decision shouldn't surprise Plaintiff. In fact, Plaintiff probably expects it and has tried to get ahead of it with certain allegations in the

---

[6] And without redressability, the Court need not address the causation arguments.

Amended Complaint. But Plaintiff's efforts fall short. The Federal Secretary argues it has neither caused Plaintiff's injury nor can its injury be redressed because invalidating the SPA puts prior amendments in control, and those versions define change in scope of services nearly the same as the SPA. Plaintiff has a regulatory ace up its sleeve—or so it thinks. Under 42 C.F.R. § 430.15(c)(1), Plaintiff says at any time the Federal Secretary may reject "previously approved material [that] no longer meets the requirements for approval." Applied here, Plaintiff argues the Court can invalidate the SPA and do the same with the earlier versions for the same reasons—i.e., none jive with federal guidance on PPS. The Federal Secretary unsurprisingly reads the regulation differently.

The Court need not weed through the parties' competing statutory interpretations. That's because the result is the same. Even accepting Plaintiff's reading, the Court still cannot compel the Federal Secretary to review a non-existent state plan amendment. And Plaintiff has presented no binding authority or persuasive argument to suggest otherwise. So § 430.15(c)(1) does not save Plaintiff's standing against the Federal Secretary.

To sum up, the Court grants the Federal Secretary's motion to dismiss as to Count I because Plaintiff lacks standing to bring it. With Count I resolved, the Court turns to the declaratory judgment claim as against the Federal Secretary.

### 2. *Count III: Declaratory Judgment*

The Federal Secretary argues that Count III fails to state a plausible claim because a declaratory judgment is a form of relief—not a standalone claim. (Doc. 39 at 23). Count III reads much like the other counts except it is couched in a declaratory judgment language. For instance, Count III asks the Court to declare the SPA to be invalid, the Federal Secretary's approval of the SPA's change-in-scope definition to be arbitrary and capricious, and the Pre-Existing Language to conflict with § 1396a(bb)(3). (Doc. 31 at 28). Before the Court reviews the Federal Secretary's dismissal argument, however, it must first decide whether Plaintiff has standing to bring Count III. *See* 28 U.S.C. § 2201 ("In a case of actual controversy [a court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); *Methelus v. Sch. Bd. of Collier Cnty., Fla.*, No. 2:16-cv-379-SPC-MRM, 2017 WL 3421470, at *2 (M.D. Fla. Aug. 9, 2017) ("This 'actual controversy' is the same as a justiciable 'case or controversy' under Article III." (citation omitted)). Plaintiff stumbles at this initial step; Count III suffers the same standing shortcomings as Count I.

There is no case or actual controversy because (again) the Federal Secretary has no state plan amendment to review. Plaintiff wants this Court to require the Federal Secretary to review a non-existent amendment even though he may do so on its own once the State Secretary submits one. This is

untenable. Doing what Plaintiff wants would amount to the Court issuing an advisory decision and subverting the core of Article III's justiciability requirements. *See Coffman v. Breeze Corps. Inc.*, 323 U.S. 316, 324 (1945) (explaining that a declaratory judgment action "may not be made the medium for securing an advisory opinion in a controversy which has not arisen"); *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974 (11th Cir. 2005) ("In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims." (citations omitted)). So the Court also dismisses Count III for lack of standing.

In conclusion, the Court grants the Federal Secretary's motion to dismiss Plaintiff's claims against him for lack of standing. Because Plaintiff does not satisfy this jurisdictional threshold, the Court need not address whether its claims separately fail under Rule 12(b)(6). The Court now turns to the State Secretary's motion.

**B. The State Secretary's Motion to Dismiss**

In Count II, Plaintiff alleges the State Secretary violated the PPS payment provisions in § 1396a(bb)(3) because the SPA's change-in-scope definition leaves out "the type, intensity, duration and/or amount of services" language from federal guidance. Plaintiff continues that it has an enforceable right under 42 U.S.C. § 1983 to be paid per the formula set in § 1396a(bb)(3).

11

The State Secretary disagrees, arguing Plaintiff has no private cause of action under § 1983 to bring Count II.

Section 1983 allows a plaintiff to obtain relief against any person who, under color of state law, has deprived the plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. But not every federal law is actionable under § 1983. For a plaintiff to seek relief under § 1983, it "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in original). The framework for discerning whether a federal statute creates a federal right is provided in *Blessing*. There, the Supreme Court set a three-factor test to analyze this question.

The first factor is whether Congress intended the statute to benefit the plaintiff. The Supreme Court has clarified this prong by holding that only "an unambiguously conferred right" can support a cause of action under § 1983. *Gonzaga U. v. Doe*, 536 U.S. 273, 283 (2002). To unambiguously confer a federal right, a statute's text "must be 'phrased in terms of the persons benefitted,'" with "rights-creating terms." *Id.* at 284 (citation omitted).

The second *Blessing* factor is whether the plaintiff can "demonstrate that the right assertedly protected by the statute is not so vague and amorphous that the judiciary is strained to enforce it." *Blessing*, 520 U.S. at 341.

And the final factor requires that the statute unambiguously obligate the States, meaning "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory terms." *Id.*

Whether § 1396a(bb)(3) meets the *Blessing* factors is a question of first impression in the Eleventh Circuit. At least six other circuits, however, have found other subsections of § 1396a(bb) to be enforceable under § 1983.[7] Although these cases are not binding, they inform the Court's analysis. Before the Court goes there, however, a full recap of § 1396a(bb)(3) helps. Again, it governs the PPS payment for services provided by FQHCs and reads:

> for services furnished during fiscal year 2002 or a succeeding fiscal year, the State plan *shall* provide for payment for such services in an amount (calculated on a per visit basis) that is equal to the amount calculated for such services under this subsection for the preceding fiscal year—
>
> (A) Increased by the percentage increase in MEI . . . a applicable to primary care services . . . for that fiscal year; and
>
> (B) Adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during that fiscal year.

---

[7] *See, e.g.*, *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 371 (5th Cir. 2018), *as revised* (Feb. 1, 2018); *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1013 (9th Cir. 2013); *N.J. Primary Care Ass'n v. N.J. Dep't of Hum. Servs.*, 722 F.3d 527, 539 (3d Cir. 2013); *Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*, 551 F.3d 10, 17-18 (1st Cir. 2008); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005).

§ 1396a(bb)(3) (emphasis added). Against this statutory language, it's clear that all three *Blessing* factors favor a right to sue under § 1983.

First, § 1396a(bb)(3) uses mandatory and clear language that requires States to repay FQHCs for its services. And it goes the extra step of providing the formula for calculating the payment. The clear focus is on benefitting FQHCs and ensuring they are repaid. This focus remains the same even if the reimbursement rate decreases because FQHCs are still guaranteed some repayment. By requiring states to ensure that FQHCs are paid, the subsection suggests that FQHCs are its intended beneficiaries. Second, § 1396a(bb)(3) provides the formula for calculating the repayments. In other words, it provides judicially administrable standards. Specific requirements that a state reimburse FQHCs for certain services, at definite amounts, are far from overly vague or amorphous. *See Pee Dee Health Care*, 509 F.3d at 212. And finally, § 1396a(bb)(3) binds the States with mandatory language—"the State plan shall provide." Thus, the *Blessings* factors establish that § 1396a(bb)(3) confers a private right enforceable through § 1983.

With that resolved, the Court must next decide whether the federal guidance by CMS is based on a permissible construction of § 1396a(bb)(3)(B) to get deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844-45 (1984). *See Sanchez Fajardo v. U.S. Att'y Gen.*, 659 F.3d 1303,

14

1307 (11th Cir. 2011). The State Secretary argues it does not, and thus the Court owes no deference to the CMS guidance. The Court disagrees.

The CMS guidance reasonably interprets § 1396a(bb)(3)(B) consistent with Congress' intent. Remember that § 1396a(bb)(3) says a state must pay an FQHC at a rate that is "adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during that fiscal year." The CMS guidance, in turn, says that "A change in the 'scope of services' is defined as a change in the type, intensity, duration and/or amount of services." The State Secretary makes much ado about how the word "scope" appears with "amount" and "duration" in all but two times throughout § 1396a. (*See* Doc. 40 at 13-20). As best the Court can tell, the State Secretary seems to argue that because the words usually appear together that suggests "scope" cannot mean "amount" and "duration." It also says the only times the words do not appear together is in § 1396a(bb)(3)(B), the relevant subsection here. And the absence means that "Congress did not intend for payments to FQHCs to be adjusted based on increases or decreases in the amount or duration of service." (Doc. 40 at 15). The State Secretary thus maintains the CMS guidance's definition saying otherwise is wrong. Not so. The State Secretary's longwinded interpretations are dense and overcomplicates the issue. And Plaintiff falls into a similar trap of obscurity.

15

The Court reads the statutory language must simpler—as it must. *See Alfaro-Garcia v. U.S. Atty. Gen.*, 981 F.3d 978, 981-82 (11th Cir. 2020) ("The fundamental principle governing any exercise in statutory interpretation is that [courts] begin[ ] where all such inquiries must begin: with the language of the statute itself, and . . . give effect to the plain terms of the statute." (cleaned up)). Congress wants a state to reimburse an FHQC at a predetermined, fixed rate adjusted for "*any* increase or decrease" in the scope of services it provides. Using "any" instructs this Court that Congress intended the scope of services to be broad and encompass many circumstances. And using the term "scope" also suggests room for FQHCs to receive adjustments for a wide range of reasons. So CMS defining that term to include "a change in the type, intensity, duration and/or amount of services" keeps in spirit of Congressional intent to make sure the medical providers caring for Medicaid eligible patients are being reimbursed for the services they provide. Both sides' quibbling arguments lose the forest for the trees and miss Congress' straightforward intent. The Court thus denies the State Secretary's arguments against *Chevron* deference and its motion to dismiss. Count II survives.[8]

Accordingly, it is

**ORDERED:**

---

[8] Because the State Secretary made no arguments as to Count III, it too survives as alleged against him.

16

(1) Defendant Secretary Xavier Becerra's Motion to Dismiss the Amended Complaint (Doc. 39) is **GRANTED**.

(2) Defendant Simone Marstiller's Motion to Dismiss Amended Complaint (Doc. 40) is **DENIED**. Defendant must answer the Amended Complaint on or before **December 24, 2021**.

**DONE and ORDERED** in Fort Myers, Florida on December 10, 2021.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of record